IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| BRIAN TRUE, | ) | |
| | ) | |
| Plaintiff, | ) | 4:07CV3280 |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF NEBRASKA, ROBERT HOUSTON, Director, Department of Correctional Services, an Agency of the State of Nebraska, DIANE SABATKA-RINE, Warden, Lincoln Correctional Center, ROBERT MADSEN, Deputy Warden, Lincoln Correctional Center, | ) ) ) ) ) ) ) ) | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the court following a nonjury trial in this case. The Eighth Circuit remanded this case and instructed the court to make findings of fact and conclusions of law as to whether inmates had access to the prison parking lot in question in this lawsuit. *True V. Nebraska,* 612 F.3d 676 (8th Cir. 2010). Pursuant to Fed. R. Civ. P. 52(a), the court makes the following Findings of Fact and Conclusions of Law.

**FINDINGS OF FACT**

1. Plaintiff Brian True ("True") originally sued the defendants pursuant to 42 U.S.C. § 1983, alleging violations of his constitutional rights under the First, Fourth, and Fourteenth Amendments. This court granted summary judgment in favor of the defendants on all claims. Filing Nos. 51 and 52. Thereafter, True appealed to the Eighth Circuit. The Eighth Circuit remanded on the Fourth Amendment claim because of a factual dispute as to the accessibility of inmate access to the parking lot in question in this lawsuit.

2. True attended Doane College in Nebraska. He worked for the Nebraska State Patrol. He received four weeks of training and then received an assignment to work in the Lincoln Correctional Center. He worked as a correctional officer, worked the towers, worked the yard and worked in the housing unit. Eventually he was promoted to corporal.

3. The Lincoln Correctional Facility is a medium/maximum security facility for adult males. There are four distinct sides around the parking facility. The fourth side of the grounds is the primary entrance to the prison. It is an unsecured entry point. Persons are permitted to drive into this area and enter the lobby of the prison. There are two primary buildings located at this facility, the Lincoln Correctional Center and the Diagnostic & Evaluation Center. These two buildings operate with many shared services. Close by is the Cornhusker State Industries Building which contains work opportunities for some of the inmates.

4. In January 2007, True received a phone call from the shift supervisors, Sergeant Moore and Sergeant Blood, who indicated they were going to search his car. True parked his vehicle in a parking lot adjacent to the Lincoln Correctional Center for use by employees and the general public. This parking lot is located outside of the secure confines of the facility. At first True believed the supervisors were joking. He then asked the consequences for declining permission to search the car, and he was told he would be suspended without pay. True did not know of any random searches prior to that time. In February 2007, the shift supervisor notified True that he was suspended without pay, pending disciplinary action for failure to consent. His car was searched. He then reviewed the policies, found none, argued he was coerced, and then asked for his ombudsman. The Ombudsman's Office notified True, as well as Director Robert Houston and Warden Diane

Sabatka-Rine,[1] on April 13, 2007, that the policy may be constitutional. In April 2007, Lieutenant Francis told True to report to the lot where an incident report was written for refusal to consent to the search of his vehicle. The Director suspended True on April 15. A hearing was conducted and a record made on May 31, 2007. Ex. 104. The defendants terminated True on June 28, 2007. Thereafter, True testified he was unable to find work in his field. True considers himself on hold until this case is decided.[2]

    5.  The court finds there is a provision in the employee handbook that vehicles are subject to search at any time. Ex. 101, p. 8. Further, there is a Nebraska Department of Correctional Services Security Manual authorizing searches outside the confines of the institution on an irregular, but frequent basis. This includes parking areas. Ex. 120, p. 9. There is also a sign in the parking lot indicating that vehicles are subject to search.

    6.  The Lincoln Correctional Center conducts random searches of employees' vehicles parked in the lot outside of the prison's confines. This lot is also open to the general public. The vehicles owned by the general public are not searched without a warrant.

    7.  No regular prisoners in the Lincoln Correctional Center have access to the parking lot in question. However, it is clear that the community custody inmates have access to that parking lot, and this access occurs during all three shifts. The court finds that these inmates are not watched at all times. The testimony indicated that the Central Control does monitor the cameras, but they are not monitored at all times, and this is a

---

[1] At all relevant times Warden Sabatka-Rine served as the Warden of the Lincoln Correctional Center, a facility under the Department of Corrections.

[2] There may also be some disability issues which might prevent future work at the Nebraska correctional facilities.

secondary responsibility for the guards in Central Control. Further, there are not outside patrols watching this parking lot. These custodial inmates are not supervised all of the time, and some work completely independently of a supervisor. There is often not direct staff supervision of the custodial inmates.

8. The court credits the testimony of Director Robert Houston. The defendant, Robert Houston, is the Director of Corrections. He started working with the State of Nebraska in 1973 and served as warden from 1993 through 1997. Houston was familiar with True, although he did not directly conduct the search. Houston, however, sets policy and handles the terminations. Director Houston testified that refusal to search is grounds for termination, undermines safety and security in the institution, and creates future problems. He testified that searches include employees as well as inmates. Houston further testified that it was his understanding that random searches are constitutional. He said there was a policy in place, although he did not know when that policy started. See Ex. 101, Employee Handbook, Section 3.9. The purpose of the random searches is to keep contraband out of the prisons. They accomplish this goal by use of dogs, x-ray machines, searches of persons and property, and by observations.

9. Warden Diane Sabatka-Rine became involved the day after True refused to allow the search. The court likewise credits her testimony. She testified that staff returning to the building are not always searched. She also testified that the parking lot is part of the institution and so the vehicles can be searched. See Ex. 116. She contends that the handbook authorizes the searches and that Major Nielsen had been told to start random searches on a periodic basis. Each week the Captain would designate parking spaces for

searches, not the car itself, but the space. Again, she testified that there was concern about the contraband in and out of the facility. She served as the hearing officer for True.

10. Robert Madsen, Deputy Warden of the Lincoln Correctional Center, testified that marijuana had been found in the parking lot and there were a couple of incidents with ammunition inside employee cars. The employees were instructed to take the ammunition home. There was a sign on the facility stating that vehicles were subject to search. Matt Heck, Assistant Warden, testified that there are a number of community correction inmates on the premises who pose a risk of introducing contraband on the premises. These inmates are searched randomly. The court credits this testimony.

11. Security Captain Darlene Percival, a Captain at the Lincoln Correctional Center, testified that the Major told her to come up with a random search protocol at an increased level. She came up with the plan that would highlight five or six stalls weekly. She gave it to the shift supervisor each week for each shift. If a car was parked in that stall, it was searched. She testified that the schematic was done on a Friday for the following week. Security Captain Darlene Percival testified that she gave the Lieutenant a sheet of paper that listed the spaces to be searched that day. The court likewise credits this testimony.

12. True testified that he did not have to park in the lot in question, and he could have parked in Pioneers Park and walked from that lot to work.

13. Lincoln Correctional Center staff are not searched every time they leave the facility during a shift.

14. It is possible that an employee could leave the Lincoln Correctional Center, go to the parking lot in question, and return with contraband. The employees can leave for

breaks, lunch, or physically take their car and leave the facility to smoke a cigarette. Searches of those employees who return to the facility are not routine but are performed on a random basis.

15. There is a tower that overlooks the facility and parking lot. There is only one staff person in the tower. That person is responsible for monitoring several different areas as well as the parking lot. Central Control monitors radio traffic, inmate movement, radios, keys, weather, and, secondarily, they also monitor surveillance monitors, depending on their other duties. There is one person assigned to perform all of these duties, and two are assigned if it is a high volume time. These monitors are not pro-actively watched.

16. It is possible for an employee to report for work, go through a search at that time, later go to the parking lot and obtain contraband, and return and not be searched.

## CONCLUSIONS OF LAW

1. The question this court must decide is whether these facts support a finding of a Fourth Amendment Constitutional violation.

2. "The Fourth Amendment protects 'the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures. . . .'" *True*, 612 F.3d at 680. "The Amendment guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government, without regard to whether the government actor is investigating crime or performing another function." *Id*. (*citing City of Ontario v. Quon*, 130 S. Ct. 2619, 2627(2010), *quoting Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 613-14 (1989). "The Fourth Amendment applies as well when the Government acts in its capacity as an employer." *Id*.

6

3. The Eighth Circuit has addressed the privacy expectation of corrections officers: "While correction officers retain certain expectations of privacy, it is clear that, based upon their place of employment, their subjective expectations of privacy are diminished while they are within the confines of the prison." *Id*. at 681, *citing McDonell v. Hunter,* 809 F.2d 1302, 1306 (8th Cir. Iowa 1987). "We believe that society is prepared to accept this expectation of privacy as reasonable although diminished 'in light of the difficult burdens of maintaining safety, order and security that our society imposes on those who staff prisons.'" *Id*., *quoting Security and Law Enforcement Employees, Dist. C, No. 82 v. Carey,* 737 F.2d 187, 204 (2d Cir. 1984). "In this case, as to step one, the parties appear to agree that True had such a 'diminished' expectation of privacy." *Id.*

4. In general, there must be a search warrant prior to the search of a vehicle. *True,* 612 F.3d at 681. The Eighth Circuit stated: "Special needs" is one exception to this rule. *Id*. "By the same balancing of individual rights against the interests of the correctional institution in maintaining security, we find that it is not unreasonable to search vehicles that are parked within the institution's confines where they are accessible to inmates. Such searches may be conducted without cause but must be done uniformly or by systematic random selection of employees whose vehicles are to be searched. It also is not unreasonable to search on a random basis, as described *supra*, employees' vehicles parked outside the institution's confines if it can be shown that inmates have unsupervised access to those vehicles." *Id*. at 682 (*citing McDonell*, 809 F.2d at 1309, and *Hudson v. Palmer,* 468 U.S. 517 (1984). *See also City of Ontario v. Quon,* 130 S. Ct. at 2628 ("[i]ndividuals do not lose Fourth Amendment rights merely because they work for the

government instead of a private employer," *quoting* O'Connor v. Ortega, 480 U.S. 709, 717 (1987).

5. A state cannot condition public employment on a basis that infringes an employee's constitutional protected rights. *Connick v. Myers,* 461 U.S. 138, 142 (1983).

6. Where an employee has a legitimate privacy expectation, an employer's intrusion on that expectation "for noninvestigatory, work-related purposes, as well as for investigations of work-related misconduct, should be judged by the standard of reasonableness under all the circumstances." *Quon,* 130 S. Ct. at 2628; citing *O'Connor,* 480 U.S. at 725-26.

7. "A lot outside the confines of a prison has greater potential to be a source of contraband when prisoners have access to it." *True,* 612 F.3d at 682.

8. *McDonell* stands for the proposition that random searches of employee vehicles inside the facility is permitted when inmates have access to the parking area and outside the facility where inmates have unsupervised access to the parking lot. As stated in *McDonell*:

> [W]e find that it is not unreasonable to search vehicles that are parked within the institution's confines where they are accessible to inmates. Such searches may be conducted without cause but must be done uniformly or by systematic random selection of employees whose vehicles are to be searched. It also is not unreasonable to search on a random basis, as described *supra*, employees' vehicles parked outside the institution's confines if it can be shown that inmates have unsupervised access to those vehicles. Any other vehicle search may be made only on the basis of a reasonable suspicion, based on specific objective facts and reasonable inferences drawn from those facts in light of experience, that the vehicle to be searched contains contraband. We believe this is reasonable in light of *Hudson v. Palmer, supra*, in which the Supreme Court granted prison officials "unfettered access" to prisoners' cells as places where inmates can conceal contraband. *Hudson v. Palmer, supra,* 468 U.S. at 527. We affirm the district court's order as to vehicle searches with the above modifications.

*McDonell v. Hunter*, 809 F.2d 1302, 1309 (8th Cir. 1987).

  9. The real question is whether the general prison population at the Lincoln Correctional Center had unsupervised access to the outside parking lot in question.

  10. No Lincoln Correctional Center inmate had access to this parking lot according to the evidence presented to the court.

  11. However, community custody inmates can leave and re-enter the facility. They do have access to all institutional grounds, including the parking lot. They are sometimes assigned to a crew or sometimes work on their own. There are tower guards, surveillance cameras, central control, and perimeter patrols, but not always one-on-one observation. There are times when these custody inmates are not directly supervised. They may or may not be strip-searched each time they enter or leave the facility. The court finds there is not 24/7 supervision of these custody inmates.

  12. The court finds the purpose of the random search policy of vehicles is to help prevent contraband from entering the facility.

  13. The court finds the searches are random.

  14. The court finds the search in question occurred outside the institution's confines.

  15. The court finds the random search policy is reasonable because the evidence shows that custodial inmates have unsupervised access to the parking lot. The court further finds that such supervision is intermittent and irregular.

  16. The court also finds that based on the evidence presented, the search was reasonable because it is meant to keep contraband out of the institution, and the search is random and not targeted toward particular individuals.

Accordingly, the court finds in favor of the defendants and against the plaintiff. A separate judgment will be entered in accordance with these Findings of Fact and Conclusions of Law.

DATED this 11th day of April, 2011.

BY THE COURT:

s/ Joseph F. Bataillon
Chief District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.